UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALCOLM P. COLEMAN,

          Petitioner,

                                  CASE NO. 2:07-CV-15172

    v.                          JUDGE AVERN COHN

                                  MAGISTRATE JUDGE PAUL J. KOMIVES

SHIRLEE A. HARRY,

          Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     E.    *Jury Instruction Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               a.  Prior Inconsistent Statement Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               b.  Specific Intent Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     F.    *Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
          2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     F.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                        *      *      *      *      *

I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas

corpus.

II.    REPORT:

A.    *Procedural History*

        1.       Petitioner Malcolm P. Coleman is a state prisoner, currently confined at the Muskegon

---

[1]By Order entered this date, Shirlee A. Harry has been substituted in place of Mary Berghuis as the proper respondent in this action.

Correctional Facility in Muskegon, Michigan.

2.      On February 4, 2005, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; and home invasion, MICH. COMP. LAWS § 750.110a(2), following a jury trial in the Oakland County Circuit Court.  On February 22, 2005, he was sentenced as a third habitual offender, MICH. COMP. LAWS § 769.11, to a term of 25-50 years' imprisonment on the armed robbery conviction and to a concurrent term of 20-40 years' imprisonment on the home invasion conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE TRIAL COURT'S IMPROPER INSTRUCTION REGARDING THE USE OF PRIOR INCONSISTENT STATEMENTS CONSTITUTES REVERSIBLE ERROR AS IT DENIED APPELLANT A FAIR TRIAL.

II.     THE FAILURE TO INSTRUCT APPELLANT'S JURY THAT AIDERS AND ABETTORS MUST HAVE THE NECESSARY SPECIFIC INTENT TO BE GUILTY OF SPECIFIC INTENT CRIMES AND THAT HOME INVASION IS A SPECIFIC INTENT CRIME CONSTITUTES REVERSIBLE ERROR AS IT DENIED HIM A FAIR TRIAL.

The court of appeals concluded that petitioner had waived his instructional error claims by counsel's acquiescence in the jury instructions,  and affirmed his conviction and sentence.  *See People v. Coleman*, No. 261844, 2006 WL 3375048 (Mich. Ct. App. Nov. 21, 2006) (per curiam).

4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Coleman*, 477 Mich. 1112, 730 N.W.2d 225 (2007).

5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on December 6, 2007.  As grounds for the writ of habeas corpus, he raises the two claims that he raised in the state courts.  He also contends that counsel was ineffective for failing to object to the

2

jury instructions.[2]

      6.    Respondent filed her answer on February 10, 2009. He contends that petitioner's

claims are barred by petitioner's procedural default in the state courts and without merit.

B.    *Factual Background Underlying Petitioner's Conviction*

      The evidence adduced at trial was accurately summarized in the prosecutor's brief in the

Michigan Court of Appeals:

> At trial, Sam Berman testified that he was 74 years old. (II, 34-35). On February 27, 2004, Sam Berman lived in a home in West Bloomfield with his wife. (II, 35). At 6 p.m., the doorbell rang and Sam Berman's wife went to the door and told him that there were two men there. (II, 36, 61). Mrs. Berman asked Sam to get the door because they were getting ready to eat dinner. (II, 36, 61). After Sam Berman opened the door a couple of inches, defendant's codefendant Randy Stradley (hereinafter Stradley) stuck his foot inside the door. (II, 36, 62). Stradley flashed a police badge and stated something about a major police operation. (II, 36-37, 62-63, 89). Stradley worked his body into the house and defendant followed. (II, 37-38). Neither man had Sam Berman's permission to enter his home. (II, 38). Defendant closed the door. (II, 91)
>
> Sensing that something was not right, Sam Berman requested more identification. (II, 38, 63-65, 92). Stradley pulled out a black revolver and stuck it into Sam Berman's stomach. (II, 38-39, 65, 81, 89-90, 92). Stradley stated: "Go down son-of-a-bitch." (II, 39, 81).
>
> At that time, Sam Berman's wife entered the foyer and began screaming. (II, 40, 79, 81). Mrs. Berman was trying to push the strangers out of her house. (II, 67, 79). Defendant was telling Mrs. Berman to be quiet. (II, 67, 80). Defendant tackled Mrs. Berman, causing her to fall onto the floor. (II, 40, 67-69, 84-89).
>
> Sam Berman did not move and Stradley hit him, causing him to hit the wall and fly down onto the floor. (II, 39). Sam Berman was still having problems with his left shoulder as a result of being pushed. (II, 81).
>
> Sam Berman was telling defendant that Mrs. Berman was "a sick lady." (II, 41, 93). Mrs. Berman had recently had surgery and Sam Berman believed that his wife had fainted. (II, 41, 84, 93).
>
> Defendant stated that he would take care of Mrs. Berman and he wrapped Mrs. Berman's legs and hands with duct tape. (II, 41, 69-70, 84, 93). Stradley picked up Sam Berman and kept repeating: "Where is your safe, son-of-a-bitch?" (II, 42). Sam Berman told Stradley that he did not have a safe. (II, 42). Stradley forcefully removed

---

    [2]Respondent previously filed a motion to dismiss, arguing that petitioner's ineffective assistance of counsel claim was not exhausted. The Court disagreed and denied respondent's motion to dismiss.

Sam Berman's ring. (II, 42). Stradley tried to remove Sam Berman's watch, but he could not do so and Sam Berman offered to remove it because Stradley was tearing his "hand apart." (II, 42). Sam Berman gave Stradley his watch. (II, 42).

Stradley asked defendant to check if everything was clear *(i.e.,* no one was looking in the windows or walking around outside). (II, 43, 83-84, 94). After checking, defendant stated: "everything is clear." (II, 43).

Stradley made Sam Berman bend down so that Sam Berman could not be seen through the windows. (II, 43). Stradley took Sam Berman to the home's master bedroom. (II, 43). Stradley threw Sam Berman onto the bed and told him to lie face down. (II, 44-45). Stradley then duct taped Sam Berman's feet and hands and put a sheet over him. (II, 44). Stradley had his knee in Sam Berman's back and a gun to Sam Berman's head. (II, 65-66).

Sam Berman could not breathe. (11, 44). Sam Berman was a heart patient. (II, 44). Sam Berman could feel himself turning blue and he begged Stradley to uncover him so that he could breathe. (II, 44). Sam Berman thought that he was going to die. (II, 44). Stradley did not respond to Sam Berman's plea and Sam Berman rolled until he loosened the duct tape on his legs and fell off the bed. (II, 44).

Sam Berman realized that Stradley was going through the drawers. (II, 45). Stradley kept saying where's the jewelry, where's the safe, where's the money. (II, 45). Sam Berman told Stradley where his wife's jewelry was hidden and Stradley put it inside a pillowcase from the Bermans' bedroom. (II, 45).

Stradley asked Sam Berman for money. (II, 45). Sam Berman said that he did not have any and gave Stradley his wallet. (II, 45). Stradley stated that there had to be cash and he wanted Sam Berman to unlock a locked dresser. (II, 45-46). Sam Berman told Stradley where the key was, but the dresser only had papers inside, which Stradley threw onto the floor. (II, 46).

Stradley kept asking for money. (II, 46). Sam Berman reported that his wife had won some money on a cruise. (II, 46). Stradley unwrapped Sam Berman's hands and made him look through his wife's clothes' pockets. (II, 46). Sam Berman eventually found about $4,500 his wife had won on the cruise. (II, 47).

Defendant came into the bedroom, took the money and told Stradley: "hey we got what we came for, let's go." (II, 47, 72-76, 93).

Defendant and Stradley pulled Sam Berman from the closet. (II, 47). Stradley told Sam Berman to lie down in the hallway and put his head in the comer. (II, 47). Stradley again bound Sam Berman. (II, 47).

Sam Berman thought that he was going to die. (II, 47). Instead, Sam Berman heard the front door open and close. (II, 47). Sam Berman then heard a car start and drive away. (II, 47-48). Sam Berman saw that the car was a black truck. (II, 50).

After a few minutes, Sam Berman got the duct tape off his legs and, then, he went to kitchen and cut the bindings on his hands with a fruit knife. (II, 48). Sam Berman called 911. (II, 48). Sam Berman went to find his wife and she was alive. (II, 48). Sam Berman cut the tape from his wife's hands and feet. (II, 49).

Thirty-one photographs of the jewelry stolen from the Bermans, including Mrs. Berman's engagement ring and her late mother's ring, were admitted. (II, 51-59).

All the items in the photographs were returned to the Bermans; other items taken were not returned. (II, 60). Sam Berman did not get any of the money taken from him back. (II, 60).

Sam Berman thought that defendant had been ransacking the remainder of the house while Stradley and Sam Berman were in the master bedroom because everything was "dumped out on the floor." (II, 92-93).

Sam Berman testified that he did not "sleep nights." (II, 70). Sam Berman took pills and had locks put on his house. (II, 70). Sam Berman testified: "They destroyed my life." (II, 70).

Minnie Berman testified that she was 68 years old. (II, 96). The doorbell rang and, after looking in the peephole, she just assumed that it was men who had called earlier about giving an estimate for fertilizer. (II, 97, 110). She called Sam to the door. (II, 97). The next thing Minnie knew, the men were in the house and, in Yiddish, she told Sam: "[A]re you crazy? Why did you let them in?" (II, 97, 111).

Minnie was telling the men to get out and she pushed them. (II, 97-98, 111). Defendant grabbed Minnie by her arm and pushed her down. (II, 98-99). Defendant was saying: "[S]hhh, shhh, shhh." (II, 99). Then, Minnie was on the floor where defendant taped her wrists and feet. (II, 99, 108-109, 111).

After hearing Sam say that she was sick and that she had fainted, Minnie pretended to have fainted. (ST, 99-100). Minnie was afraid that she was going to be killed. (II, 100). Minnie kept hearing Stradley asking Sam for a safe, which Sam denied having. (II, 100, 113). After hearing footsteps and lying on the floor, Minnie heard defendant say: "Let's get the fuck out of here." (II, 102-103, 114). Minnie also heard a crash, like glass hitting the floor. (II, 103).

It became quiet and Minnie heard the front door. (II, 103). Later, Sam came and cut Minnie's bindings. (II, 104). Minnie was glad that Sam was alive. (II, 104). Minnie also talked to 911. (II, 105). Then, the paramedics came and treated both Minnie and Sam. (II, 105-106).

Four additional pictures of jewelry were identified by Minnie. (II, 107-108). The 911 tape was played for the jury and [was attached to the appellate brief] as Appendix A. (II, 115-1 16).

West Bloomfield Police Officer Peter Canelopoulos testified that he was dispatched to the Bermans' home and arrived within minutes. (II, 117-118). Photographs of Sam Berman's remaining bindings were admitted. (II, 119-120). Sam Berman told Canelopoulos what had happened. (II, 127-130). Canelopoulos called for the medics. (II, 130).

West Bloomfield Police Officer Mark Wardia testified that he was also dispatched to the Bermans' house. (II, 133). Minnie Berman was hysterical. (II, 133, 135). Photographs of Minnie Berman's remaining bindings were admitted. (II, 133-135). Minnie's wrists were bruised. (II, 141). After being calmed down somewhat, Minnie told Wardia about what occurred. (II, 136-137). Minnie reported that defendant was pacing and acted as a look out. (II, 143, 146). Photographs of the Bermans' house as it appeared were admitted. (II, 139-140).

There were muddy shoeprints throughout the Bermans' house. (II, 141). The

police found a leather planner which had been dropped by Stradley in the Bermans' foyer. (II, 145).

West Bloomfield Police Department Detective Eric Tilli testified that he went to the Bermans' home. (II, 178). Tilli saw two sets of muddy shoe prints inside. (II, 180-1 81, 205). Tilli also identified that black leather portfolio left at the scene. (II, 182). The portfolio had the Bermans' address inside along with a note about their grandchildren and a telephone list. (II, 182). The portfolio was admitted. (II, 183). Inside the portfolio, the police found a telephone number that eventually led them to Stradley. (II, 183-184).

After receiving information from a confidential informant, the police captured Stradley; however, defendant, who was with Stradley, got away. (II, 186-187). When the police arrested Stradley, he had five rings, an earring and $2,600 in cash as well as some crack cocaine and heroin. (II, 187). The photographs of those rings were admitted. (II,187-188).

After searching Stradley's apartment, the police found most of the jewelry taken from the Bermans, a roll of duct tape and a police badge. (II, 188-189, 210-211). A photograph of Stradley's pickup truck was admitted. (II, 190). Inside Stradley's truck, the police found a roll of duct tape. (II, 191, 210, 212).

On March 3, 2004, defendant was arrested. (II, 191). Defendant initially denied knowing Stradley. (II, 193, 199; III, 9). After being confronted about the police surveillance, defendant admitted knowing Stradley, but claimed that he had only known him for a few days. (II, 193; III, 10).

After defendant had spoken to his father on the telephone, defendant admitted that he and Stradley were going to rob the Bermans. (II, 194). Defendant claimed that Stradley had duct taped the Bermans. (II, 195, 203). Defendant admitted that he looked around the Bermans' house and ransacked it. (II, 195, 205). Defendant claimed that he did not find anything to take. (II, 195, 205). Defendant helped Stradley carry "bags" out of the Bermans' house. (II, 195-196, 205). Defendant told Tilli that he earned $200 for his participation in the robbery. (II, 196,205).

Defendant had also checked out some pawnshops with the help of another person, but the Bermans' property was recovered from some pawn slips the police recovered from Stradley's apartment. (II, 207-209).

Shannon Jedwab testified that the Bermans were her mother-in-law's best friends. (II, 149-150). Stradley was Jedwab's former boyfriend. (II, 150). Stradley always carried a gun. (II, 174-176). Defendant knew Stradley. (II, 150, 157).

Jedwab was driving around with Stradley and defendant in Stradley's pickup. (II, 151, 160, 169). They were getting high on crack and Stradley was also getting high on heroin. (II, 15 1, 160). Jedwab was a prostitute. (II, 167). That day, they took some things from the Bermans' trash and Jedwab told them that the Bermans had a lot of money. (II, 151, 162). They drove around the Bermans' house twice. (II, 151-152). Defendant commented on there being glass at the back of the Bermans' house and that neighbors could see inside. (II, 169-1 71). Defendant stated that they "would have to hurry up" or "go through" the front "because the neighbors could see from the back." (II, 171).

Stradley, Jedwab and defendant continued to drive and talk about doing some breaking and enterings for money and diamonds to support their drug habits. (II, 153). Later, Stradley called Jedwab to report that he had done it. (II, 153). Still later, Jedwab went to the motel where Stradley told her he was. (II, 153). When Jedwab arrived at the motel, defendant was there. (II, 153). Defendant, who was high, gave Jedwab $100 and left the motel. (II, 155, 165-167, 172). Defendant stated that he was going to go change his clothes. (II, 173-174). Stradley had a pillowcase full of jewelry and $4,000 to $5,000 in cash. (II, 155-156).

Jedwab was currently incarcerated for conspiracy to commit home invasion and home invasion. (II, 156- 157). Jedwab admitted writing the Bermans' address in the portfolio. (II, 163). She testified that she had done so because she felt indebted to Stradley, who had given her money and crack cocaine. (II, 163). Jedwab believed that Stradley would take something from the garage or yard or without the Bermans being there. (II, 163-164). Jedwab had received nothing in exchange for her testimony. (II, 157). The People rested. (III, 11).

Defendant testified that he knew Stradley for eleven years. (III, 12). Defendant testified that he abused alcohol and was addicted to crack cocaine. (III, 13, 83). The afternoon of the robbery Stradley gave defendant alcohol and cocaine. (III, 17-18). They drove to West Bloomfield. (III, 18). Defendant testified that that was the first time he had been in West Bloomfield. (III, 18). Defendant denied driving there with Jedwab. (III, 19).

Defendant claimed that he had previously gone into garages with Stradley before, but had never gone into a house. (III, 20). Defendant knew that Stradley sometimes had a gun. (III, 20-21). Defendant denied seeing Stradley's gun at the time of the Berman robbery until after they had left the Bermans' house. (III, 22, 72). Defendant thought that he and Stradley would take something from a garage or a truck to get drug money. (III, 24-25, 65).

Stradley "begged" for defendant to come with him to the Bermans' house. (III, 27). Stradley knocked on the door and defendant turned to leave, but Stradley told him to hold on. (III, 28). Defendant testified that Sam Berman opened the door and asked if defendant was coming in too. (III, 30, 67). Stradley told defendant to come inside. (III, 30). Defendant did so. (III, 30). Defendant closed the door. (III, 31).

Defendant claimed that Stradley was talking low and Sam Berman was asking if Stradley was sick. (III, 32-33). Minnie Berman then came in and yelled at Sam Berman. (III, 33). Minnie Berman then lightly touched defendant. (III, 33-34). Defendant was trying to calm her down. (III, 34). Defendant put his hands up and heard a bump. (III, 34). The bump was Sam Berman on the floor. (III, 35). Minnie Berman was screaming. (III, 34). Minnie Berman then fainted into defendant's arms, causing defendant to fall. (III, 35-36, 80).

Sam Berman came over and told defendant that Minnie Berman was sick. (III, 37). Defendant testified that Stradley duct taped Sam and Minnie Berman. (III, 37-38). Stradley told defendant to watch Minnie Berman and the window. (III, 38). Defendant asked Stradley what Stradley was doing, but Stradley just went down the hall with Sam Berman. (III, 38).

7

Sam Berman appeared worried about Minnie Berman and defendant told Sam Berman that he would take care of Minnie Berman. (III, 38-39). After some time, Stradley came back and asked if defendant saw anything outside the window. (III, 40). Defendant stated that he did not. (III, 40). Defendant told Stradley: "Come on, let's go." (III, 40, 50). Defendant was pacing back and forth. (III, 50). Defendant was "looking out." (III, 50, 73-74).

Defendant testified that Stradley asked defendant if Minnie Berman had any rings. (III, 40). Defendant stated that he did not know. (III, 40). Stradley then duct taped Minnie Berman, even though defendant was telling him not to. (III, 40, 80).

Stradley told defendant to go upstairs and look for the safe. (III. 42). Defendant looked through some drawers. (III, 43-44). Stradley had a pillowcase full of jewelry. (III, 45-46). Defendant carried the pillowcase to Stradley's truck because Stradley had something else in his hands. (III, 46-47). Defendant testified that he told Stradley: "[Y]ou got enough, let's go." (III, 49, 51).

Stradley looked around himself after defendant told him that he had not found the safe. (III, 52). Stradley knocked something over and it broke. (III, 52). Stradley drove away. (III, 53).

Stradley and defendant went to a motel. (III, 54). Stradley called someone, presumably Jedwab. (III, 54). Jedwab came to the motel. (III, 56). Defendant denied giving Jedwab $100. (III, 20). Defendant testified that Stradley gave him $240, which defendant used to buy crack cocaine. (III, 57, 78, 82-83).

Defendant admitted being with Stradley later. (III. 63). Defendant denied knowing that the police were arresting Stradley and, instead, defendant claimed that he decided to walk home from the gas station where Stradley was being arrested. (III, 631. Defendant rested. (III, 87).

The People recalled Detective Tilli, who testified that defendant did not appear under the influence when he was interviewed. (III, 89-90). The videotape of defendant's interview was played for the jury and [was attached to the appellate brief as Appendix B]. (III, 90).

Br. of Pl.-Appellant, in *People v. Coleman*, No. 261844 (Mich. Ct. App.), at 1-11.

C.  *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to object to the jury instructions at trial. Although petitioner's claims are defaulted, the Court should conclude that it is nevertheless necessary to consider the claims on the merits.

Under the procedural default doctrine, a federal habeas court will not review a question of

federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

The Michigan Court of Appeals found that a review of this claim was barred by petitioner's failure to object to the instructions at trial. *See Coleman*, 2006 WL 3375048, at *1, slip op. at 2. This contemporaneous objection rule was firmly established at the time of petitioner's trial. *See, e.g.*, *People v. Duncan*, 402 Mich. 1, 15-16, 260 N.W.2d 58, 61-62 (1977); *People v. Curry*, 175 Mich. App. 33, 39, 437 N.W.2d 310, 314 (1989). As the state court clearly and expressly relied on this state procedural rule with respect to petitioner's jury instruction claims, these claims are barred absent a showing of either cause and prejudice or a fundamental miscarriage of justice. *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims).

However, even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits. As noted above, petitioner can still have his

defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his counsel was ineffective for failing to object at trial. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

10

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle

or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Jury Instruction Claims*

As noted above, petitioner raises two challenges to the jury instructions given by the trial court. First, petitioner contends that the court erred in its instruction regarding prior inconsistent statements. Second, he argues that he was denied a fair trial by the court's failure to give an instruction on specific intent. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-

12

law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review

"ha[s] no authority to review a state's application of its own laws). Thus, in order for habeas corpus

relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than

that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole,

they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle*, 502 U.S.

at 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-

52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of

review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in

*Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have

defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502

U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Despite this deferential standard of review, a jury instruction will not withstand scrutiny if

it submits alternative theories for the jury to convict, one of which is permissible and the other

unconstitutional, and the reviewing court cannot determine on which theory the jury relied. *See Zant*

*v. Stephens*, 462 U.S. 862, 881-83 (1983); *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970); *United*

*States v. Wilkinson*, 26 F.3d 623, 625 (6th Cir. 1994). *But see Griffin v. United States*, 502 U.S. 46,

56 (1991) (general jury verdict is valid if sufficient evidence supports one of the grounds for

conviction, so long as the other submitted grounds are neither illegal nor unconstitutional, but merely

unsupported by the evidence); *United States v. Mari*, 47 F.3d 782, 785-86 (6th Cir. 1995). An

instruction is also invalid if it can be viewed by the jury as shifting the burden of proving an element

of the case onto the defendant, as when it instructs the jury to presume that a person intends to

commit the natural, ordinary and usual consequences of his voluntary actions, *see Sandstrom v.*

13

*Montana*, 442 U.S. 510, 524 (1979), or to presume malice from either an unlawful act or from the use of a deadly weapon, *see Yates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Houston v. Dutton*, 50 F.3d 381, 385-86 (6th Cir.1995). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). Nonetheless, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

    2.    *Analysis*

    *a. Prior Inconsistent Statement Instruction*

Petitioner first contends that he was denied a fair trial because the court instructed the jury that it could consider prior inconsistent statements as substantive evidence, rather than merely for impeachment. At trial, the court gave the standard jury instruction governing prior inconsistent statements: "Evidence has been offered that one or more witnesses in this case, previously made statements inconsistent with their testimony at this trial. You make consider such earlier statements in deciding whether the testimony at this trial was truthful, and in determining the facts of this case." Trial Tr., Vol. III, at 125. Petitioner contends that the last part of this instruction informed the jury that it could consider prior inconsistent statements as substantive evidence. Even if this is true, petitioner cannot show that he was denied a fair trial by the instruction because the only prior inconsistent statement offered at trial was his own statement to the police, and that statement was admissible as substantive evidence.

Under Rule 613, extrinsic evidence of a prior inconsistent statement is admissible to impeach a witness so long as the witness is afforded an opportunity to admit or deny the same. *See* MICH. R.

EVID. 613(b). Generally, evidence of a prior inconsistent statement is admissible only for the purpose of impeaching the witness, and may not be used as substantive evidence. *See People v. Jenkins*, 450 Mich. 249, 256, 260, 537 N.W.2d 828, 832, 834 (1995). However, Rule 613 also provides that the rule "does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)." MICH. R. EVID. 613(b). That rule, in turn, provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement[.]" MICH. R. EVID. 801(d)(2)(A). Here, the only evidence of a prior inconsistent statement offered at trial was petitioner's own statement to the police. And that statement constituted a statement of a party admissible as non-hearsay under Rule 801(d)(2)(A). Because the statement was admissible as non-hearsay, it was admissible as substantive evidence. As the Michigan Supreme Court explained in similar circumstances:

> *Jenkins* stands for the general proposition that prior un-sworn statements of a witness are mere hearsay and are generally inadmissible as substantive evidence. However, *Jenkins* is inapplicable because it related to impeachment of a prosecution witness with an inconsistent statement, whereas this case concerns defendant's out-of-court statement. Admissions by a party are specifically excluded from hearsay and, thus, are admissible as both impeachment and substantive evidence under MRE 801(d)(2).

*People v. Lundy*, 467 Mich. 254, 257, 650 N.W.2d 332, 333-34 (2002); *see also*, *People v. Hodges*, 179 Mich. App. 629, 632-33, 446 N.W.2d 325, 326 (1989).

In short, petitioner's prior inconsistent statement was admissible both as impeachment evidence and as substantive evidence of guilt. Because no other prior inconsistent statements were introduced at trial, the trial court's instruction regarding the use of prior inconsistent statements was an accurate statement of the law, and petitioner therefore cannot show that he was denied a fair trial by the trial court's instruction. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Specific Intent Instruction

Petitioner also contends that the trial court's instructions failed to adequately instruct the jury regarding the specific intent he needed to be guilty of the offenses with which he was charged. Specifically, he contends that the trial court failed to instruct the jury that aiders and abettors must have the same specific intent as the principal, and that home invasion is a specific intent crime.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Under Michigan law, the elements of armed robbery are (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute.  *See Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004) (Gadola, J.), *aff'd*, 173 Fed. Appx. 437 (6th Cir. 2006); *People v. Smith*, 478 Mich. 292, 319, 733 N.W.2d 351, 365 (2007).  The Michigan home invasion statute provides:

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:
> (a) The person is armed with a dangerous weapon.
> (b) Another person is lawfully present in the dwelling.

MICH. COMP. LAWS § 750.110a(2).  Thus, "[t]he elements of first-degree home invasion are: (1) the defendant broke into and entered a dwelling without permission, (2) while intending to commit or actually committing a felony, larceny, or assault while entering, exiting, or present within the dwelling, and (3) another person was lawfully present in the dwelling or the defendant was armed with a dangerous weapon."  *People v. Johnson*, No. 285172, 2009 WL 2974771, at *1 (Mich. Ct. App. Sept. 17, 2009) (per curiam).  Further, MICH. COMP. LAWS § 767.39 abolished the common law

16

distinction between aiders and abettors and principals, and provides that aiders and abettors may be prosecuted and convicted as though they had directly participated in the crime. *See People v. Palmer*, 392 Mich. 370, 378, 220 N.W.2d 393, 396 (1974). Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime either by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given. *See People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1986) (per curiam).

Here, contrary to petitioner's argument, the trial court's instructions adequately conveyed to the jury the intent necessary to find petitioner guilty as an aider and abettor of armed robbery and first degree home invasion. Petitioner does not dispute that the trial court adequately instructed the jury regarding the elements of armed robbery. *See* Trial Tr., Vol. III, at 127. The court then explained that petitioner was charged with aiding and abetting the armed robbery, and set forth the elements of aiding and abetting liability, including "that the defendant must have intended the commission of the crime alleged or must have known that the other person intended its commission at the time of giving assistance." *Id*. at 128. Thus, the trial court's instructions adequately explained the intent necessary for petitioner to be guilty of armed robbery as an aider and abettor.

With respect to home invasion, the court adequately instructed the jury that defendant could be found guilty if he "committed an assault" "when the defendant entered, was present in or was leaving the dwelling." *Id*. at 130. It is true that the trial court did not instruct the jury that it could only find petitioner guilty if he intended to commit a felony, larceny, or assault, but this intent is not a necessary element of first degree home invasion. The statute is written in the disjunctive, and

17

provides that a person is guilty either if (a) he breaks and enters with the intent to commit a felony, larceny or assault or (b) breaks and enters and actually commits a felony, larceny, or assault while in the premises. *See* MICH. COMP. LAWS § 750.110a(2). Because the prosecution proceeded on the theory that petitioner actually committed an assault while in the dwelling, it did not also need to establish that petitioner intended to do so at the time he entered. *See People v. McNeal*, No. 248341, 2004 WL 1949303, at *9 (Mich. Ct. App. Sept. 2, 2004) (per curiam); *People v. Abernathy*, No. 243745, 2004 WL 357750, at *1 (Mich. Ct. App. Feb. 26, 2004) (per curiam); *People v. Loop*, No. 226962, 2002 WL 207565, at *1 (Mich. Ct. App. Feb. 8, 2002) (per curiam). Thus, the trial court's instructions adequately conveyed all of the elements of first degree home invasion.

It is true that the court did not provide an instruction regarding aiding and abetting home invasion, having limited the aiding and abetting instruction to the armed robbery charge. However, petitioner cannot complain about this failure because his counsel argued against providing such an instruction. After the jury began its deliberations, the jury sent a note to the court asking: "Can aiding and abetting apply to home invasion as well as armed robbery?" Trial Tr., Vol. III, at 137. The prosecutor argued that the court should answer "yes," but defense counsel argued that it would be improper to give an aiding and abetting instruction with respect to home invasion after the jury had begun its deliberations. *See id.* at 138. The trial court agreed with defense counsel. Because petitioner invited this alleged error, he cannot now seek habeas relief on this basis. As the Supreme Court explained long ago, "[a] defendant in a criminal case cannot complain of error which he himself has invited." *Shields v. United States*, 273 U.S. 583, 586 (1927) (internal quotation omitted). Even if failure to give the instruction on aiding and abetting home invasion was erroneous, petitioner "invited the error by [opposing] this instruction at trial. This invited error precludes the reversal of

18

[petitioner's] conviction, as well as the grant of any habeas relief, on the basis of the alleged improper instruction." *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998); *see Draughn v. Jabe*, 803 F. Supp. 70, 75 (E.D. Mich. 1992) (Gadola, J.) (habeas relief not appropriate based on failure to give involuntary manslaughter instruction where petitioner "clearly asked not to have the jury so instructed."); *cf. Reed v. Ross*, 468 U.S. 1, 14 (counsel "may not use the prospect of federal habeas corpus relief as a hedge against the strategic risks he takes in his client's defense in state court.").[3]

Nor can petitioner show that he was prejudiced by the trial court's failure to give an instruction on aiding and abetting first degree home invasion. Such an instruction would have provided the jury with an additional basis upon which to convict petitioner, and thus would have made it easier rather than more difficult for the jury to find petitioner guilty. And, because the jury was not instructed on aiding and abetting home invasion even after they had specifically asked if it could be considered, it is clear that the jury found petitioner guilty of home invasion as a principal.

In short, the trial court's instructions adequately conveyed to the jury the elements of both armed robbery and home invasion, as well as the elements of aiding and abetting armed robbery. Further, petitioner invited error by arguing against the giving of an aiding and abetting home invasion instruction, and the absence of any such instruction was not prejudicial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.     *Ineffective Assistance of Counsel*

Petitioner also contends that his trial counsel rendered constitutionally deficient assistance by failing to object to the court's jury instructions. The court should conclude that petitioner is not

---

[3]Invited error may be overcome when the request for the instruction amounts to constitutionally ineffective assistance of counsel. *See Turner v. Calderon*, 970 F. Supp. 781, 805 (E.D. Cal. 1997); *Patterson v. Dahm*, 769 F. Supp. 1103, 1106 (D. Neb. 1991). Petitioner's ineffective assistance claim is discussed in the following section.

entitled to habeas relief on these claims.

       1.     *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

2.      *Analysis*

With respect to the prior inconsistent statement, aiding and abetting armed robbery, and home invasion instructions given by the trial court, petitioner cannot show that counsel was ineffective for failing to object to these instructions. As explained above, each of these instructions was appropriate under state law and adequately explained to the jury the relevant law. Thus, any objection by counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).

Likewise, petitioner cannot show that counsel was ineffective for arguing that the court should not give an instruction on aiding and abetting home invasion in response to the jury's note asking whether aiding and abetting liability could be found with respect to home invasion. Counsel could reasonably have concluded that the jury's note indicated that it was doubting whether petitioner was guilty of home invasion as a principal, and that allowing the jury to find him guilty as an aider and abettor would have increased the likelihood of conviction. As noted above, the existence of an aiding and abetting option would have made it easier, rather than more difficult, for the jury to find petitioner guilty on the home invasion charge. Thus, counsel's arguing against that instruction was a reasonable strategic decision, and petitioner cannot demonstrate that he was prejudiced by the absence of an instruction on aiding and abetting home invasion. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

F.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an

21

unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                                    s/Paul J. Komives


        PAUL J. KOMIVES

        UNITED STATES MAGISTRATE
JUDGE
Dated: 10/2/09

| |
|---|
| The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on October 2, 2009.<br><br>                      s/Eddrey Butts<br>                      Case Manager |